C.A. No. 99-2051C
(Senior Judge Smith)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ATHEY, ROBERT M., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# PLAINTIFFS'OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

IRA M. LECHNER
Attorney for Plaintiffs
19811-4th Place
Escondido, CA 92029
Phone: 858-864-2258
Fax; 760-839-5755

# TABLE OF CONTENTS


I. PLAINTIFFS' CLAIMS WERE FILED IN 1999, WELL WITHIN THE APPLICABLE STATUTE OF LIMITATIONS PERIOD — Page 7

II. THERE IS NO BASIS WHATSOEVER FOR DEFENDANT'S ARGUMENT THAT PLAINTIFFS ENGAGED IN UNREASONABLE DELAY IN FILING THEIR COMPLAINT; THEREFORE, DEFENDANT'S THEORY BASED ON LACHES MUST FAIL — Page 12

III. DEFENDANT MISCHARACTERIZES THE INTERPLAY BETWEEN THE LUMP-SUM PAYMENT STATUTES AND NURSES' ADDITIONAL PAY PURSUANT TO TITLE 38 — Page 15

- A. INTRODUCTION — Page 15
- B. OPM, AND THE VA, HAVE INTERPRETED THE WORD "PAY" IN THE LUMP-SUM "PAY" STATUTE TO INCLUDE PREMIUM PAY — Page 17
- C. THE STATUORY SCHEME INCLUDES ALL FORMS OF "PAY"IN THE COMPUTATION OF "LEAVE WITH PAY"AS WELL AS THE LUMP-SUM PAYMENT FOR UNUSED ANNUAL LEAVE — Page 20
- D. LEGISLATIVE HISTORY OF THE LUMP-SUM LEAVE PAYMENT — Page 24
- E. DEFENDANT'S RELIANCE ON § 7453 (i) IS MISPLACED — Page 26
- F. THE INTERPLAY BETWEEN THE LUMP-SUM LEAVE PAYMENT STATUTE AND THE LIMITATION UPON CONSIDERING ADDITIONAL PAY AS BASIC PAY IN SECTION 7453 (i) — Page 31
- G. LEGISLATIVE HISTORY OF 38 U.S.C. § 7453 (i) — Page 33
  1. The Veterans Health Care Expansion Act of 1973 — Page 33
  2. Congressional Intent — Page 34
- H. SUMMATION OF PLAINTIFFS' ARGUMENT — Page 37

# TABLE OF AUTHORITIES

## CASES


AAB Joint Venture v. United States, 75 Fed. Cl. 432, 440 (2007) — Page 15

Aamold v. United States, 39 Fed. Cl. 735 (1997) — Page 24

Abbot v. United States, 204 F. 3d 1099, 1102 (Fed. Cir. 2000) — Page 23

Abbott v. United States, 41 Fed. Cl. 553 (1998) — Page 24

Abrams v. United States, 57 Fed. Cl. 439 (2003) — Page 23

Abramson v. United States, 42 Fed. Cl. 621 (1998) — Page 24

Abreu v. United States, 948 F. 2d 1229 (Fed Cir. 1991) — Page 23, 30

Acton v. United States, 932 F. 2d 1464 (Fed. Cir. 1991) — Page 23

Adams v. United States, 27 Fed. Cl. 13 (1992) — Page 24

Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems Inc., 988 F. 2d 1157, 1161 (Fed. Cir. 1993) — Page 15

AFGE, Local 3295 v. FLRA, 46 F. 3d 73, 78 (D.C. Cir. 1995) — Page 31

Archuleta et al v. United States, — *Passim*

Armitage v. United States, 991 F. 2d 746 (Fed. Cir. 1993) — *Passim*

Artuz v. Bennett, 531 U.S. 4, 10 (2000) — Page 40

Robert M. Athey et al v. United States, — *Passim*

Bailey v. United States, Page 38
52 Fed. Cl. 105, at 110 (2002)

Barnes v. United States, Page 23
72 Fed. Cl. 6 (2006)

Barnes v. United States, Page 23
68 Fed. Cl. 492 (2005)

Bedrock Ltd. v. United States, Page 32
541 U.S. 176, 183 (2004)

Berg v. United States, Page 24
49 Fed. Cl. 459 (2001)

Bull v. Unites States, Page 23
65 Fed. Cl. 407 (2005)

Butterbaugh et al v. Dep't of Justice, Page 19, 23
336 F. 3d 1332, 1338 (Fed. Cir. 2003)

Cannon v. University of Chicago, Page 32
441 U.S. 677, 696-97, 99 S. Ct. 1946, 1957-58, 60 L.Ed.2d 560 (1979)

Carter v. Gibbs, Page 40
909 F. 2d 1452, 1455 (Fed. Cir. 1990)

Cf. Catawba Indian Tribe of So. Carolina v. United States, Page 14
982 F. 2d 1564, 1570 (Fed. Cir. 1993)

Contreras v. United States, Page 23
64 Fed. Cl. 583, 592 (2005)

Cornetta v. United States, Page 15
851 F. 2d 1372, 1375 (Fed. Cir 1988) (en banc.)

Curry v. United States, Page 23
66 Fed. Cl. 593 (2005)

Elmore v. Henderson, Page 8
227 F. 3d 1009, 1012 (7th Cir. 2000)

Brian Entendencia v. United States, Page 13
No. 06-515C, 2007 WL851211 (Fed. Cl. March 19, 2007)

Gaffney et al v. United States, *Passim*
824 F. Supp. 1 (D.D.C. 1991)

Grandits v. Unites States, Page 23
66 Fed. Cl. 519 (2005)

Holloway v. United States, Page 31
526 U.S. 1, 6 (1999)

James v. Von Zemenszky, Page 23
284 F. 3d 1310 (Fed. Cir. 2002)

Lamie v. United States Tr., Page 31
540 U.S. 526, 534 (2004)

Lanehart v. Horner, *Passim*
818 F. 2d 1574 (Fed. Cir. 1987)

Miles v. Apex Marine Corp., Page 32
498 U.S. 19, 32, 111 S. Ct. 317, 325-26, 112 L. Ed.2d 275 (1990)

Mudge v. United States, Page 27, 38
308 F. 3d 1220, 1227-28 (Fed. Cir. 2002)

United States v. Menache, Page 28
348 U.S. 528, 538-39 (1955)

White v. ABCO Eng'g Corp, Page 8
199 F. 3d 140, 145 n.6 (3rd Cir. 1999)

Williams v. Taylor, Page 28
529 U.S. 362, 404 (2000)

**STATUTES**

5 U.S.C. § 4109 (a) (1) Page 28

5 U.S.C. § 5343 (f) Page 19

5 U.S.C. § 5545(c)(1) and (2) and 5545a Page 25

5 U.S.C. §§ 5551-5552 *Passim*

5 U.S.C. § 5924(1) Page 10

5 U.S.C. § 5471 Page 10

5 U.S.C. § 2105 Page 16

5 U.S.C. 6303 Page 18

5 U.S.C. § 7121 (a)(1) Page 27

38 U.S.C. Chap. 74, sub-chapter III Page 10

38 U.S.C. §§ 7453-7454 *Passim*

38 U.S.C. § 7425 (a) Page 17

38 U.S.C. § 7425 (b) Page 29

| | |
|---|---|
| 28 U.S.C. § 2501 | Page 13 |
| Veterans Health Care Expansion Act of 1973, Pub. L. No. 93-82, 87 Stat. 179 (1973). | Page 33 |

**REGULATIONS**

| | |
|---|---|
| 5 CFR § 531.202; 5 CFR § 550103 | Page 28 |
| 64 FR 36763, 36770 (July 8, 1999) | Page 18 |
| VA Handbook 5007, Part IV, Chapter 3, Appendix B-7 (a) thru 11 | Page 19 |

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ROBERT M.ATHEY,et al.<br><br>for themselves and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant. | No. 99-2051C<br><br>(Senior Judge Smith) |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Defendant's credibility as a responsible litigant in this court has been brought into question by the irresponsible allegations contained in its Motion To Dismiss. As plaintiffs will demonstrate below, defendant's motion is entirely baseless.

### I. PLAINTIFFS' CLAIMS WERE FILED IN 1999, WELL WITHIN THE APPLICABLE STATUTE OF LIMITATIONS PERIOD

Defendant argues that plaintiffs' cause of action accrued in 1993, and the filing of the *Athey* complaint on June 21, 2006 is barred by the six-year limitations period. The core of defendant's argument is as follows ( Def.'s Brief, pp. 11-12):

> Plaintiffs here allege that the Government failed to include [*sic.*] in their lump-sum payment for accumulated and accrued leave upon their separation from service beginning on April 7, 1999. Comp. ¶ 1. Therefore, plaintiffs' cause of action accrued nearly 14 years ago and the filing of the Athey complaint on June 21, 2006 is untimely. Thus, the Court should dismiss the plaintiffs' complaint in its entirety with prejudice.

Astonishingly, defendant completely ignores this Court's "Order Approving Settlement" and "Severance Order", entered on June 1, 2006 in *Archuleta et al. v. United States,* which was originated by Plaintiffs' Unopposed Motion for Severance pursuant to RCFC 21. At the same time that the Settlement Agreement was approved, the Court ordered the "severance without prejudice" of plaintiffs' claims that had not been resolved with respect to the VA. The Court specifically noted "defendant's agreement in footnote 1 of the Settlement Agreement to such a request". Based upon that agreement, the Court ruled that "the severance of those claims to be proceeded with separately is appropriate under RCFC 21 and is in the interests of judicial economy". The Court permitted the eight former VA plaintiffs to file the *Athey* case as a separate action. The Court ordered the Clerk to "treat the claims of these plaintiffs as a single action and shall assign a separate docket number to that case with the number '99-205-1C'". Thus, the Court's Severance Order without prejudice continued the litigation involving the VA that had been initiated when the *Archuleta* complaint was first filed on April 7, 1993. It is hornbook law that when a case is severed, the original filing date carries over to the new case. *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000)( Judge Posner noted that a "separate, severed suit, though separate from the original suit for other purposes, would not have affected the tolling of the statute of limitations by the original suit. That is, it would have been a continuation of the original suit so far as he was concerned."); *White v. ABCO Eng'g Corp.,* 199 F.3d 140, 145 n.6 (3rd Cir. 1999).

Defendant's sudden memory loss of this Court's Orders in *Archuleta* is all the more shocking in that the attorneys who agreed to the Severance Order and who signed the Settlement Agreement in *Archuleta* as the "Authorized Representative of the Attorney

General" are the same attorneys who filed Defendant's Motion to Dismiss that is now being considered by this Court in *Athey*. Moreover, during the Fairness Hearing in *Archuleta* in which defendant's counsel actively participated, the Court took specific note of the necessity of issuing a Severance Order with respect to the pending claims by those plaintiffs who were former employees by the VA.

A brief recital of the history of the *Archuleta* litigation should be sufficient to provide a sound basis for rejection of defendant's motion to dismiss on statute of limitations grounds. Michael R. Clayton and Thelma R. Curry are former employees of the Department of Veterans Affairs ("VA"). They were named specifically as plaintiffs in the Archuleta class action complaint filed on April 7, 1999 which established the six-year limitations period beginning April 7, 1993 (CIVIL DOCKET FOR CASE #: 1:99-cv-00205-LAS and CLASS ACTION COMPLAINT FOR MONEY DAMAGES, both on file in the Clerk's Office). On October 4, 1999, plaintiffs filed an Amended Class Action Complaint for Money Damages, and on October 23, 2002, the Court granted plaintiffs leave to add six (6) former VA employees (Robert M. Athey, Richard S. Droske, Ralph L. Fullwood, Paul D. Ising, Charles A. Milbrandt, and Troy E. Page) as additional named plaintiffs.

The *Archuleta* complaint was brought as a class action on behalf of former employees of all agencies of the United States, which obviously included the VA. Paragraph 3 of the initial and amended complaints, entitled "Class Description", specified that the plaintiff class on whose behalf the action was brought consisted of: "All civilian employees who retired, died , or separated after April 6, 1993 …from employment by the United States or an agency, establishment or instrumentality thereof…".

The amended complaint referred to the agencies' failure to include in the computation

of the employees' lump-sum payment for unused annual leave all of the "pay" that retired or separated members of the putative class would have earned had they remained in the service of the United States for the duration of the period of unused annual leave in their account on the date of their retirement, death, or separation pursuant to 5 U.S.C. §§ 5551-5552. This is precisely the same claim for relief alleged in the Third Amended Complaint in *Athey*. [1]

Thus, in 1999, defendant was fully apprised by both of the *Archuleta* complaints that the putative class included former employees of the VA as well as employees of other Government agencies, and that the VA was identified as one of those agencies. The VA was identified as an agency that had employed some of the named plaintiffs by specific references to the named plaintiffs' last place of employment in Exhibit 1 attached to each complaint, and to plaintiffs' motion for leave to add additional plaintiffs.

Moreover, on April 7, 1999, the *Archuleta* plaintiffs filed "PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION". As part of the typicality argument for class certification, plaintiffs explicitly identified "premium pay" claims against the VA, as follows (Pl. Brief, pp.14-15):

In order to satisfy the typicality criterion, plaintiffs have included former

[1] Some of the specific examples cited in *Archuleta* complaints of the "pay" that the United States should have, but did not, include in the computation of the lump-sum payment included Sunday premium pay (*see*, *Archuleta* complaint, Para. 3(c)); "special or heightened rate of pay" (*Archuleta* class description, Para. 3(i)); Foreign area post allowances under 5 U.S.C. § 5924(1)(*Archuleta* complaint, Para. 3(d)); Physician's comparability allowance and Special Pay for Physicians and Dentists under 5 U.S.C. § 5471 and 38 U.S.C. Chap. 74, sub-chapter III (*Archuleta* complaint, Para. 3 (h)); and Nurses', Physician Assistants', and other health care professionals' additional and weekend duty pay pursuant to 38 U.S.C. § 7453 and § 7454 ("Introduction" to the *Archuleta* complaint as well as Para. 3(j)). Plaintiffs' Amended Complaint in *Archuleta* added claims with respect to general pay increases that the agencies of the United States had not included in the computation of the lump-sum payment for unused annual leave (Pl. Exhibit 6). The same claims are alleged in *Athey* with respect to the VA.

> Federal employees who were employed by a number of agencies in different occupations and collectively received a variety of premium pay[s] which were not included in the computation of their lump-sum payment. For example plaintiffs… [identifying VA plaintiff Michael Clayton among others] were employed either by the Army, Air Force, Navy, VA…[and] were regularly scheduled to receive night pay, and/or Sunday pay….
>
> Plaintiffs Margaret Cowles (LVN) and Thelma Curry (RN) were employed as Veterans Administration nurses (Occupational Code 664) in California. They regularly worked nights and weekends (including Sundays) and received nurses' and other health care professionals' additional pay, but those premium pays were not included in their lump-sum for unused annual leave.

As early as September 24, 1999, the parties filed a joint motion to stay further proceedings in *Archuleta* as they began negotiations in pursuit of a settlement. On October 4, 1999, the Court granted the requested stay. The case continued to be stayed by a succession of Orders requested by joint motions of plaintiffs and defendant in order to enable the parties to conduct and complete complicated settlement negotiations. Finally, on February 2, 2006, the parties presented a motion for preliminary approval of a Settlement Agreement and Settlement Distribution Plan with respect to the former employees of 17 identified federal agencies which did not include the VA. On June 1, 2006, the Court conducted a Fairness Hearing to consider that settlement. The Court heard the joint requests of the plaintiffs, and the government, to approve the Settlement Agreement that resolved with finality the class action claims relating only to those 17 agencies. Accordingly, defendant's counsel, Ms. Snyder, informed the Court: "The government has looked at records from the 17 agencies that are included in the settlement, and other government and Plaintiffs' counsel have reviewed documents as well" (Transcript, Fairness Hearing, p. 13). The Court then took note of the unresolved claims pending against the VA in the Archuleta litigation. The Court stated: "The one thing we need to proceed with is the severed plaintiffs in this case, and what kind of schedule should we have to see what's happening with that group?" (Transcript, pp. 17-18).

There can be no doubt whatsoever that the class action claims of these eight (8) VA plaintiffs were raised, but not resolved, in the *Archuleta* case from April, 1999 to June, 2006. Moreover, the parties were in total agreement to sever those class action claims without prejudice to a separate case with its own case number when on June 1, 2006—in settlement of *Archuleta*---this Court certified a class of employees who had been employed by 17 agencies other than the VA.

The *Athey* case was created by this Court's Severance Order pursuant to the specific agreement of the United States, not because plaintiffs failed to file a complaint within the limitations period. Defendant's argument that the *Athey* case "is untimely" because it was filed 14 years too late is unquestionably baseless. It is rebutted completely by the history of this litigation.

## II. THERE IS NO BASIS WHATSOEVER FOR DEFENDANT'S ARGUMENT THAT PLAINTIFFS ENGAGED IN UNREASONABLE DELAY IN FILING THEIR COMPLAINT; THEREFORE, DEFENDANT'S THEORY BASED ON LACHES MUST FAIL

To support its alternative theory of dismissal based on laches, defendant once again pretends that the claims against the VA in the *Athey* case sprung forth for the first time on June 21, 2006 when the First Amended Complaint was filed pursuant to the schedule established by the Court. Inexplicably, defendant ignores the direct relationship between the filing of the *Athey* case and the settlement of the *Archuleta* case which was based upon the specific agreement of the Government to sever the claims against the VA "without prejudice" to a separate case. Defendant argues that the *Athey* case is barred by laches because: "Here, plaintiffs have known since before April 1993 of their claims against the VA and yet they did not file this complaint until June 2006". Def.'s Brief, p.13 (underlined emphasis in the

original). But, the initial complaint in *Archuleta* was filed on April 7, 1999, thereby establishing the applicable starting point of the six-year limitations period as April 7, 1993 (28 U.S.C. § 2501).

Defendant goes even further and shifts its alleged factual predicate by claiming: "It is clear that plaintiffs were aware of their claims as early as 1991, and most probably before then". Def.'s Brief, p. 13, fn. 4. As its only evidence of plaintiffs' alleged deleterious delay, defendant cites that *plaintiff's counsel* filed a case in the District Court in 1991 (*Gaffney et al. v. United States,* 824 F. Supp. 1 (D.D.C. 1991)) with respect to the computation of premium pay as part of a lump-sum payment upon retirement or separation. The District Court refused to certify a class. The named plaintiffs in *Gaffney* were GSA employees, not VA employees, and none of the named plaintiffs in *Athey* were named plaintiffs in *Gaffney*. And, to compound defendant's error even more, the named plaintiffs in *Athey* had not even retired or separated from the VA in 1991.[2] Defendant acknowledges that the date of retirement or separation is the critical date for determining when their cause of action accrued. As this Court has recently reaffirmed, "'a claim accrues when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action'". *Brian Entendencia v. United States*, No. 06-515C, 2007 WL 851211 (Fed. Cl. March 19, 2007).

Defendant has cited no reported precedent for the dubious principle that the class action claims of the *Athey* VA plaintiffs are barred by laches because *their counsel* had asserted a

[2] *Archuleta* plaintiff Michael R. Clayton separated on May 3, 1993 and plaintiff Thelma R. Curry retired on January 31, 1997; Robert M. Athey retired on December 31, 1995; Richard S. Droske retired on June 10, 1999; Ralph L. Fullwood retired on September 17, 1993; Paul D. Ising retired on September 28, 1998; Charles A. Milbrandt retired on January 2, 1999; and Troy E. Page retired on June 3, 1994; all subsequent to the April 7, 1993 date. Defendant did not raise the statute of limitations in the *Archuleta* litigation. The OPM, and the VA, possess the best evidence of the date of each plaintiff's retirement or separation. If defendant contests the accuracy of these dates of retirement or separation, plaintiffs intend to serve a written request for the admission of the truth of these facts pursuant to RCFC 36 as soon as the time specified by RCFC 26(d) permits.

similar claim eight (8) years earlier in a different case for an entirely different group of plaintiffs, even before the cause of action had accrued for any of the named *Athey* plaintiffs. Nor has our research revealed any other case where the Department of Justice has asserted such a claim. Certainly, neither the Federal Circuit nor this court has ever so held. *Cf.*, *Catawba Indian Tribe of So. Carolina v. United States*, 982 F.2d 1564, 1570 (Fed. Cir.1993). Plaintiffs' counsel's representation of a different group of plaintiffs in the *Gaffney* case in 1991 has no bearing on these right of these VA plaintiffs' to bring their own action in this court in 1999 after their own claims had accrued.

As we have demonstrated, plaintiffs' claims involving the VA: (1) were filed as early as April, 1999 within each plaintiffs' limitations period as part and parcel of *Archuleta*; (2) those claims were unresolved in *Archuleta*; (3) the VA claims were severed from *Archuleta* by express agreement of the Government; and (4) the VA claims were transferred "without prejudice" by Order of this Court to a new case entitled *Robert M. Athey et al. v. United States* in June, 2006. Defendant's laches argument should be summarily dismissed by this Court as absurd on its face. The named plaintiffs in *Athey* did not wait 14 years after they retired or separated from employment with the VA to file their class action claims concerning the VA's failure to properly compute their lump-sum payments. Defendant knows full well that these class action claims specifically directed against the VA have been pending in this court for eight (8) years. Indeed, what the *Athey* case is really about is that these plaintiffs, and the entire class of former VA employees that they represent, have had to wait many years for their day in court while complex negotiations proceeded in *Archuleta* until the government agreed to settle with respect to 17 agencies other than the VA. Had those negotiations collapsed in 2006, the class action claims of the VA plaintiffs would have had to proceed forward as part of, and

within, the *Archuleta* litigation along with the claims of all other federal employees regardless of which agency employed them.

The claims with respect to the VA were "severed without prejudice" by order of this Court with the explicit concurrence of the Government.[3] The time for resolution of these claims has finally arrived, yet the government persists in asserting legally baseless statute of limitations and laches arguments that are unworthy of any consideration.

## III. DEFENDANT MISCHARACTERIZES THE INTERPLAY BETWEEN THE LUMP-SUM PAYMENT STATUTES AND NURSES' ADDITIONAL PAY PURSUANT TO TITLE 38

### A. INTRODUCTION

Defendant's arguments with respect to the inclusion of "additional pay" for registered nurses, other health care professionals, and "hybrid" employees affect only a small number of

---

[3] The Federal Circuit revisited and clarified the laches doctrine in 1988 in *Cornetta v. United States,* 851 F. 2d 1372, 1375 (Fed. Cir. 1988)(en banc). Laches requires: (1) Unreasonable and unexcused delay in bringing the claim, and (2) material economic prejudice to defendant as a result of the delay. *See also, Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc*., 988 F. 2d 1157, 1161 (Fed. Cir. 1993). Here, there was no unreasonable and unexcused delay as plaintiffs brought their class action claims in 1999 as part of the *Archuleta* case. Moreover, defendant has not carried its burden that the VA would suffer material economic prejudice as a result of the alleged "delay" inasmuch as it has been apprised of the substance of the claims specifically involving the VA since the very beginning of the *Archuleta* case in 1999, and all the evidence required to prove or disprove plaintiffs' claims consists of computer pay records maintained by the VA or OPM in the regular course of business. The duty to preserve relevant evidence for litigation attaches when suit is filed, and even whenever a party reasonably should know that the evidence may be relevant to anticipated litigation. *AAB Joint Venture v. United States*, 75 Fed. Cl. 432, 440 (2007). Here, the VA has been committed for decades by VA Directives to automating time and attendance records and payroll information; defendant can not claim, and has not claimed, that those computer records have been destroyed.

the allegations in plaintiffs' pending Third Amended Complaint. *See*, Pl. Complaint, paragraph 2, subparagraphs 3-6, and 9. The majority of the allegations in the Complaint are unaffected by this section of defendant's Motion to Dismiss.

The VA is an enormous agency with hundreds of thousands of employees. It operates more than 1,400 health care facilities and administers benefits to millions of veterans. It employs tens of thousands of persons who are administrators, clerks, security personnel, maintenance employees, etc.. These General Schedule ("GS") employees are appointed pursuant to title 5, U.S.C., and their basic pay as well as their entitlement to premium pay is governed entirely by provisions of title 5. In its motion to dismiss, defendant does not challenge the entitlement of these GS employees to the lump-sum payment.

The VA also employs thousands of specialized health care professionals appointed pursuant to title 38, U.S.C., such as doctors, dentists, and nurses, whose basic pay and premium pay are governed by provisions contained in title 38. Another unique group employed by the VA includes other health care professionals (pharmacists, licensed vocational nurses, respiratory therapists, etc.) whose employment benefits are governed principally by the provisions of title 5, but they earn premium pay in the form of "additional pay" for night, weekend, on-call, and overtime work pursuant to provisions of title 38. These persons are referred to as "hybrid" employees.

While the distinctions are confusing as to which VA employees' benefits and entitlements are governed by title 5 or by title 38, one legal premise is irrefutable: There is no dispute whatsoever that VA employees are federal employees as defined by 5 U.S.C. § 2105, and that all such salaried VA employees are covered by the lump-sum payment statutes, 5 U.S.C. §§ 5551-5553.

**The VA does not, and can not, contest the applicability of the lump-sum payment statutes to health care professional employees such as registered nurses, and hybrids, who are appointed under chapters 73 and 74 of title 38. Indeed, the Secretary has acknowledged that: "The provisions of 5 U.S.C., chapter 55, subchapter VI [§§ 5551-5553], which provide for lump-sum payment of annual leave, are for application to employees appointed under 38 U.S.C., chapter 73 and 74" (VA Handbook 5011, Part III, Chapter 3, section 12, April 15, 2002; VHA Supplement, MP-5, Part II, Chapter 7.11 (a)(1)).** And, while physicians, dentists, nurses and other health care professionals are exempted from a number of enumerated provisions of title 5 and the Civil Service Reform Act, Congress chose not to exempt them from the lump-sum payment provisions of Chapter VI of title 5 (§§ 5551-5553). *See*, 38 U.S.C. § 7425 (a).

**B. <u>OPM, AND THE VA, HAVE INTERPRETED THE WORD "PAY" IN THE LUMP-SUM "PAY" STATUTE TO INCLUDE PREMIUM PAY</u>**

Plaintiffs submit that the starting point for the statutory analysis here is the interpretation of 5 U.S.C. § 5551 (a), which is the operative statute upon which plaintiffs' class action claims depend. Section 5551 (a) requires that all of an employee's regular and customary "pay" be included in the lump-sum payment computation. That provision contains a mandate from Congress that, upon retirement or separation, each federal employee "is entitled" to receive a lump-sum payment for unused annual leave that "shall equal the pay (excluding any differential under section 5925 and any allowance under section 5928) the employee or individual would have received had he remained in the service until expiration of the period of annual or vacation leave".

It is well established that the word "pay" in the lump-sum payment statute includes more than "basic pay". It also includes regularly earned premium pay for the following reasons:

**(**1**)** Congress has entrusted the Office of Personnel Management ("OPM") with the authority to "prescribe regulations necessary for the administration" of the lump-sum payment statutes. 5 U.S.C. § 5553. OPM has issued Final Regulations interpreting Congress' use of the generic word "pay" in the lump-sum payment statute as including premium pay and as not limited to basic pay: "Issuing final regulations to limit lump-sum payments to those that are basic pay for retirement purposes would be contrary to the lump-sum payment law." 64 FR 36763, 36770 (July 8, 1999);

(2) The Federal Circuit in *Lanehart v. Horner*, 818 F.2d 1574 (Fed. Cir. 1987) and *Armitage v. United States*, 991 F.2d 746 (Fed. Cir. 1993) interpreted Congress' use of the same word "pay" as encompassing <u>both premium pay and basic pay</u> when employees are paid for using "leave with pay". Over time, Congress enacted an overall statutory scheme instructing the agencies that federal employees are entitled to be paid all of their regularly earned "pay" whether they use annual leave or whether the employees receive money in lieu of using annual leave. In either instance, the annual leave statute (5 U.S.C. 6303) and the lump-sum payment statutes guarantee that when employees earn accrued and accumulated hours of paid vacation, the employees should receive their customary and regular compensation for that period of time. Inasmuch as the lump-sum payment for accrued and accumulated annual leave is *in lieu of "leave with pay",* the lump-sum payment statute and the "leave with pay" statutes are closely related. As the Federal Circuit noted, "While consistency is not necessarily the paramount imperative of statutory interpretation, we, like other courts, are close-minded enough to expect

that administrative agencies ordinarily will construe the same term in closely-related statutes consistently." *Butterbaugh, et al. v. Dep't of Justice*, 336 F. 3d 1332, 1338 (Fed. Cir. 2003). Accordingly, consistency would be assured by construing "pay" to include premium pay in addition to basic pay in the interpretation of the lump-sum payment statute as well as in the "leave with pay" statutes.

(3) Moreover, the VA Secretary agrees with the premise that the word "pay" is not restricted only to basic pay. The Secretary has adopted a policy which specifically includes a number of designated "types of premium pay under title 5 and title 38, to the extent such premium pay was actually payable to the employee" within the computation of the lump-sum payment. These premium pays include night differential under 5 U.S.C. § 5343 (f), standby duty pay, overtime pay under title 5 and the FLSA, supervisory differential, cost-of-living allowance, and foreign area post allowance in certain circumstances. *See*, VA Handbook 5007, Part IV, Chapter 3, Appendix B-7 (a) thru 11 (attached hereto as Pl. Ex. 8). But, based on the wording of § 7453 (i), the Secretary insists on selecting *which* premium pay to exclude from the computation of "pay" from the lump-sum pursuant to § 5551 (a), thus excluding regularly earned "additional pay" for night work, weekend work, overtime work, and on-call duty. But, Congress pointedly did not bar additional premium pay entirely from the lump-sum payment. Rather, Congress only cautioned agencies not to consider additional pay as "basic pay" in computing the lump-sum. The Secretary misinterprets the wording of subsection (i) by treating the terms "basic pay" in subsection (i) as interchangeable with the word "pay" in the lump-sum payment statute. Plaintiffs contend that the Secretary is wrong; there is an obvious disconnect between the two terms that undermines the premise of defendant's motion to dismiss.

(4) Finally, section 7453 (a) of title 38 specifically recognizes the distinction between "basic pay" and premium pay ( entitled "additional pay") with the following injunction: "*[a]In addition to the rate of basic pay provided for nurses, a nurse shall receive additional pay as provided by this section.*"(emphasis supplied). The language of subsection (a) demonstrates conclusively that Congress was fully aware of the distinction between basic pay and additional premium pay in the very same statute that limits additional pay from being considered as "basic pay" when computing the lump-sum payment for unused annual leave. And, as we shall demonstrate, when Congress wants to exclude a specific subset of "pay" from a payment of compensation, it does so with clarity. Defendant's reliance upon subsection (i) for that purpose does not meet this test.

**C. THE STATUTORY SCHEME INCLUDES ALL FORMS OF "PAY" IN THE COMPUTATION OF "LEAVE WITH PAY"AS WELL AS THE LUMP-SUM PAYMENT FOR UNUSED ANNUAL LEAVE**

The "leave with pay" statutes and the lump-sum annual leave payment statute are analogous within title 5. Under this comprehensive statutory scheme, the statutes are closely related.

The Court of Appeals for the Federal Circuit has unmistakably ruled that the "leave with pay" statutes of chapter 63, title 5, prohibit any reduction in an employee's regular and customary pay when the employee uses paid leave. *Lanehart v. Horner*, 818 F.2d 1574 (Fed. Cir. 1987) and *Armitage v. United States*, 991 F.2d 746 (Fed. Cir. 1993). Plaintiffs submit that the principle is precisely the same with respect to the lump-sum payment statute: premium pay must be included in the lump-sum payment whether it derives from a provision of title 5 or from a provision of title 38.

In *Lanehart*, *supra*, federal firefighters who regularly and customarily were scheduled to work 38 hours of overtime each two week pay period brought suit to recover back pay and interest. *Lanehart*, 818 F.2d at 1575-77, 1576 n.8. Federal government agencies, including the VA, failed to pay them the same amount of wages when they used "leave with pay" as they would have earned if they had remained at work at their regular schedule instead of taking paid leave. *See id.* at 1576. The government argued that it did not owe the firefighters any overtime pay when they took leave because they did not work overtime during leave. *Id.* The firefighters countered that the obvious purpose of "leave with pay" was to ensure that employees would receive the same amount of "pay" while on leave as they would regularly and customarily earn while at work. *Id.* at 1578.

The court of appeals agreed after analyzing the "leave with pay" statutes. The court noted that the meaning of the word

> "pay" as used in the "leave with pay" statutes has consistently been construed for more than a century as encompassing the total compensation or remuneration normally and regularly received by an employee. Buttressing this conclusion is the fact that Congress has used more limited terms, rather than the generic term "pay," when it intended to refer to specific types of pay. For example, §§ 5504, 5542 and 5545 use the phrase "basic pay" and §§ 5542, 5545, 5546 and 5547 speak to "premium pay." Moreover, when Congress has intended to exclude certain types of remuneration from a pay statute it has done so with clarity. In 5 U.S.C. § 4109(a)(1), for example, Congress defined the quantum of pay as "all or a part of the pay (except overtime, holiday or night differential pay) of an employee…selected and assigned for training…."

*Id.* at 1581-1582.

The government also argued that the FLSA provisions of title 29 trumped the requirement of title 5 that all of the employee's regular "pay" must be included by virtue of the "leave with pay" statutes. *See Lanehart*, 818 F.2d at 1578, 1582. The court rejected that argument. The court concluded that leave with pay "in Title 5 means total compensation or remuneration normally and regularly received" even when the employee's regular compensation arises under a title of the United States Code other than Title 5. *Id.* at 1582-83.

Six years later, in *Armitage v. United States*, 991 F.2d 746, 748, 751 (Fed. Cir. 1993), the court of appeals reaffirmed its holding in *Lanehart* when it considered the entitlement to Sunday premium pay of federal civilian police officers on paid leave who were regularly scheduled to work on Sundays. When the police officers worked on Sundays, they received a twenty-five percent premium pursuant to 5 U.S.C. section 5546(a). *See id.* at 748-49.

The government argued that the premium pay statute required that work be "performed" on Sunday in order to receive the premium, and thus the police officers were not entitled to have the Sunday premium included in their "pay" when the employees were on annual, sick, or other paid leave rather than at their regular work station. *Armitage*, 991 F.2d at 750. The government also cited an Office of Personnel Management ("OPM") regulation that only employees who perform work on Sunday were entitled to the premium pay, and that the court of appeals should defer to OPM's statutory interpretation. *Id.* at 749-50. The court concluded otherwise:

> As in *Lanehart*, we are faced with reading statutes potentially in conflict with one another in attempting to achieve harmony therebetween. The difficulty of this task is not altered by their existence in the same title.
>
> . . .

> Also, as in *Lanehart*, the government's reliance on OPM's interpretations is to no avail. Ltr. 550 16 in this case, just as with Ltr. 551-5 Attach. 2 in *Lanehart*, expressly implements only the Sunday premium pay statute, and therefore as in *Lanehart*, does not aid our interpretation of the "leave with pay" statutes. Thus, consistent with and mandated by our decision in *Lanehart*, we hold as a matter of law that the appellees in this case are entitled to receive Sunday premium pay for hours regularly scheduled for work on Sunday, but which were not worked due to charged periods of authorized annual or sick leave.

*Id.* at 750.

Neither *Lanehart* nor *Armitage* have been overruled or otherwise qualified, modified or weakened over the last 15 years. Indeed, both decisions have been followed by the Federal Circuit and this court in a succession of cases over the years: *Abbot v. United States*, 204 F.3d 1099, 1102 (Fed. Cir. 2000); *Butterbaugh v. Department of Justice*, 336 F.3d 1332 (Fed. Cir. 2003); *Abreu v. United States*, 948 F.2d 1229 (Fed. Cir. 1991); *Acton v. United States*, 932 F.2d 1464 (Fed. Cir. 1991); *Barnes v. United States*, 72 Fed. Cl. 6 (2006); *Barnes v. United States*, 68 Fed. Cl. 492 (2005); *Bull v. United States*, 65 Fed. Cl. 407 (2005); *Curry v. United States*, 66 Fed. Cl. 593 (2005)[4]; *Grandits v. United States*, 66 Fed. Cl. 519 (2005); *Abrams v.*

---

[4] Judge Wolski's ruled in *Curry* that the government violated both title 5 and VA regulations by refusing to pay premium pay to hybrids, nurses, and other VA health professionals when they used paid leave. The government tried to argue that the subsection (i) exclusion applied to all statutes based on pay including the "leave with pay" statutes. The court rejected defendant's argument as "not interpreting [the statute]; it is legislating—which is not a job for the courts". *Curry, id*, at 600. Judge Wolski also commented with respect to the meaning of subsection (i), but it was plainly *obiter dicta* as the VA's application of the lump-sum payment statute was not in issue on the merits. *Curry* did demonstrate yet another instance where the VA refused to obey Congress' mandate by misapplying the plain meaning of the statute. Congress enacted a provision of the 1997 Appropriations Act that Sunday pay was no longer to be paid unless the employee actually performed work on Sunday. The VA promptly instructed its personnel that "Sunday" meant "Saturday" as well. The VA argued in *Curry* that Congress had sent "a signal" to the courts that premium pay could not be paid to VA employees during leave with pay. The court rejected the argument and admonished the VA, *id*., *fn* 13: "But clearly 'Sunday' does not mean 'Saturday and Sunday,' nor does it mean 'nighttime'. And the only signal that counts is the law itself; 'the Congress does what it says and means what it says.' *Contreras v. United States*, 64 Fed. Cl. 583, 592 (2005)'[additional citations omitted]." And, in *James v. Von Zemenszky*, 284 F.3d 1310 (Fed. Cir. 2002), *rehearing denied*, 301 F. 3d 1364 (Fed.Cir. 2002), the court overturned yet another attempt by the VA to try to use a provision of title 38 to trump employee protections embodied in title 5 statutes.

*United States*, 57 Fed. Cl. 439 (2003); *Berg v. United States*, 49 Fed. Cl. 459 (2001); *Abramson v. United States*, 42 Fed. Cl. 621 (1998); *Abbott v. United States*, 41 Fed. Cl. 553 (1998); *Aamold v. United States*, 39 Fed. Cl. 735 (1997); *Adams v. United States*, 27 Fed. Cl. 13 (1992).

**D. LEGISLATIVE HISTORY OF THE LUMP-SUM LEAVE PAYMENT**

The genesis of the statutory scheme that ultimately became §§ 5551-5552 with respect to unused annual leave was the experience of the United States government during the World War II. The government needed to fill civil service positions that were necessary to the war effort when federal employees were being inducted into the armed services in large numbers. The underlying premise of the legislation was that, in practice, the employees would receive their total compensation when they used up their accumulated and accrued "terminal leave" and then exited federal employment. Congress concluded that the employees might as well be paid that same sum of money as a lump-sum to facilitate their exit from federal employment with their unused annual leave intact. The General Accounting Office summed up the legislation as follows:

> To expedite entry of federal civilian employees into the Armed Forces during World War II, Congress authorized agencies to make lump-sum payments for accumulated, unused annual leave to employees who were separating from federal civilian service to enter the armed forces. Previously, the Dual Compensation Act had prohibited federal civilians entering the armed services from receiving compensation from both civilian office and military pay if the combined amounts exceeded $2,000 per year and agencies were not authorized to "buy back" an employee's accumulated, unused leave. When employees retired or otherwise left federal service, agencies commonly carried them on the payroll in a "terminal leave" status until they had exhausted all unused annual leave. These practices potentially could have delayed federal civilian employees' entry into military service until their leave was exhausted.
>
> Agencies' authority to buy back a separating employee's accumulated, unused annual leave was extended to all employees in 1944 (58 Stat. 845). Under this statute, any employee who leaves federal service with unused annual leave is to receive a lump-sum payment for that accumulated leave. The lump-sum payment is calculated based on the pay that the employee would have received for the leave, as if the employee had

> remained in service until the leave was exhausted. To illustrate the calculation method, if an employee's date of separation had been January 3, 1997, and he or she had 200 hours of unused annual leave, the lump-sum leave payment would have been calculated as if the employee actually worked an additional 25 days, excluding any holidays.

U.S. Gen. Accounting Office, Report Number GGD-97-100, Federal Civilian Personnel: Cost of Lump-Sum Annual Leave Payments to Employees Separating from Government, Letter: 2 (May 29, 1997).

OPM then issued final regulations that "establish a uniform Governmentwide policy for calculating lump-sum payments for accumulated and accrued annual leave for employees who separate from Federal service in accordance with 5 U.S.C. 5551 or 5552." OPM Memorandum for Directors of Personnel and Agency Payroll Offices (CPM 99-2). OPM explained its interpretation of the statute as follows:

> The term ``pay'' is not further defined in law. In the final regulations, we have interpreted this term to mean the pay the employee would have received on a biweekly basis had he or she remained in Federal service on annual leave. The components of two large agencies commented that any pay excluded from retirement basic pay should also be excluded from lump-sum payments for annual leave. In effect, this would limit a lump-sum payment to basic pay and certain types of premium pay, such as annual premium pay under 5 U.S.C. 5545(c)(1) and (2) and 5545a. One of the agencies stated that it would support a final regulation limiting lump-sum payments to basic pay, excluding FLSA overtime pay. In addition, an individual commented that a lump-sum payment should not be adjusted to include any extra pay or benefits such as Sunday premium pay, night pay, or any general pay adjustments or within-grade increases that become effective after the employee separates from Federal service. Under 5 U.S.C. 5551, a lump-sum payment ``must equal the pay (excluding any differential under section 5925 and any allowance under section 5928) the employee or individual would have received had he remained in the service until expiration of the period of the annual or vacation leave.'' Issuing final regulations to limit lump-sum payments to those that are basic pay for retirement purposes would be contrary to the lump-sum payment law…. Under 5 U.S.C. 5551, a lump-sum payment must equal the pay an employee would have received had he or she remained in Federal service until expiration of the period of annual leave (excluding any differential under section 5925 and any allowance under section 5928).

64 FR 36766, 36770 (July 8, 1999).[5]

[5] Defendant's brief cites *Gaffney v. United States*, 834 F. Supp. 1,4-5 (D.D.C. 1993), for the proposition that limiting the lump-sum payment only to basic pay was "permissible, reasonable, and entitled to deference". Def. Brief, p.8. However, OPM's subsequent Final Regulation (and the VA Handbook), that interprets "pay" as not limited to basic pay in the computation of lump-sum payments, entirely undercuts the District Court's analysis in *Gaffney* and renders that decision irrelevant as well as erroneous.

**E. <u>DEFENDANT'S RELIANCE ON § 7453 (i) IS MISPLACED</u>**

As may be expected in healthcare facilities that must function twenty-four hours per day, "additional pay" is paid to VA registered nurses, other health care professionals, and hybrid employees for working a regular schedule of hours at night, on weekends, overtime, and in other situations pursuant to 38 U.S.C. §§ 7453-7454. Section 7453 (b) provides premium pay for night work between 6 p.m. and 6 a.m.; § 7453 (c) provides premium pay for weekend work commencing at midnight Friday; § 7453 (d) provides for holiday pay; § 7453 (e) provides overtime pay; and § 7453 (h) provides for premium pay for on-call duty.

The Secretary has acknowledged in the VA Handbook that the lump-sum payment includes premium pay in addition to basic pay. Consequently, the only conceivable argument for excluding additional pay earned under § 7453 (b)-(h) from the lump-sum is the wording of § 7453 (i) (italics supplied):

> (i) Any additional pay paid pursuant to this section shall not be considered as *basic pay* for the purpose of the following provisions of title 5 (and any other provision of law relating to benefits based on basic pay):
>
> (1) Subchapter VI of chapter 55 [the lump-sum payment statutes].
> (2) Section 5595.
> (3) Chapters 81, 83, 84, and 87.

Throughout its brief, defendant just slides over the distinction between "pay" in § 5551 (a) and "basic pay' in § 7453 (i) as if the two terms were identical. The VA argues that subsection (i) operates as a complete barrier to the inclusion within the lump-sum payment of any additional pay delineated in § 7453 (b) through (h).

Plaintiffs disagree with the VA's interpretation of subsection (i). Unmistakably, the lump-sum payment statute under which plaintiffs claim back pay and interest requires a

computation including the entire compensation, i.e., the "pay" (not just "basic pay") that the retiring or separating employee would have received had he or she remained in the government's employ for the remainder of the period of unused annual leave.

In *Mudge v. United States*, 308 F. 3d 1220, 1227-28 (Fed. Cir. 2002), the court of appeals rendered a statutory interpretation of the word "administrative" in 5 U.S.C. § 7121 (a)(1). The court's analysis and reasoning there is compelling precedent to aid this Court in its interpretation of subsection (i):

> It is beyond debate that statutory interpretation begins with the language of the statute. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999) ("As in any case of statutory construction, our analysis begins with the language of the statute.") (internal quotation omitted); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756 (1975) ("The starting point of every case involving construction of a statute is the language itself."); Weddel v. Sec'y of Dep't of Health & Human Servs., 23 F.3d 388, 391 (Fed. Cir. 1994) ("Under the traditional rule of statutory interpretation, courts must look first to intrinsic evidence of intent (i.e., the textual language) alone."). Accordingly, we begin our inquiry with the text of the CSRA itself. Section 7121(a)(1) directs that, with a few enumerated exceptions, the negotiated grievance procedures set forth in a federal employee's CBA are to be "the exclusive administrative procedures for resolving grievances that fall within [the CBA's] coverage." 5 U.S.C. § 7121(a)(1) (2000) (emphasis added). Because the statute does not define the word "administrative," see 5 U.S.C. § 7103, we presume that Congress intended to give that term its ordinarily understood meaning, see Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning.") (internal citation omitted).

There can be no doubt that "basic pay" is a sub-set of "pay". "Basic pay" is a commonly understood and applied term-of-art which is referred to by Congress through the United States Code. "Basic pay" is defined by OPM as well as by the Secretary's own regulations in the VA's own regulatory Handbook, as the rate of compensation paid to federal employees equivalent to a regular salary on an annual basis ("Rate of basic pay means the rate of pay fixed by law or administrative action for the position held by an employee before any

deductions and exclusive of additional pay of any kind" 5 CFR § 531.202; 5 CFR § 550103; "The rate of pay fixed by law or administrative action for the position held by an employee before any deductions and exclusive of additional pay of any kind." VA Handbook 5007, Part IV, Chapter 3, subsection 6 (e)).

There is simply no case to be made that "basic" pay" and "pay" are synonymous. By its very definition, "basic pay" necessarily is "exclusive of additional pay of any kind", while "pay" has been consistently interpreted to include premium pay in addition to basic pay. Inasmuch as the plain meaning of "basic pay" is so well established by statute and regulation, it is not susceptible of any contrary interpretation, and the Court simply can not strip away the word "basic" from the phrase "basic pay" in § 7453 (i) to render it as interchangeable with "pay" in § 5551 (a). In short, the adjective "basic" cannot be simply and safely ignored. Congress must be deemed to have intended precisely what is meant by the plain meaning of "basic pay". *See, Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is . . . a cardinal principle of statutory construction that we must 'give effect, if possible to every clause and word of a statute.' *United States v. Menache*, 348 U.S. 528, 538-39 (1955)." (additional citations omitted)).

In § 5551 (a), Congress completely barred two categories of premium pay from being included in the lump-sum computation-- "any differential under section 5925 and any allowance under section 5928". Unquestionably, Congress explicitly excluded those two premium pay provisions from inclusion in the computation of the lump-sum payment with clarity. Courts can only conclude that Congress certainly knows how to exclude such subsets of "pay" from the lump-sum computation when it wanted to do so, but it did not intend such a result when it enacted subsection (i). *See also*, *i.e.,* 5 U.S.C. § 4109 (a) (1), where Congress

was specific in excluding subsets of "pay" with respect to expenses of training: an agency may "pay all or part of the pay (except overtime, holiday or night differential pay) of an employee…."

The inevitable conclusion of this analysis, in conformity with the rules of statutory construction, is that Congress definitely excluded nurses' additional pay from being "considered as basic pay" when lump-sum payments are calculated, but it is equally clear that Congress did not bar such additional pay from being considered as premium pay in the calculation of "pay" which is the broader generic terminology used in § 5551 (a).

In arguing that the "basic pay" provision of 38 U.S.C. § 7453 (i) trumps the term "pay" in 5 U.S.C. § 5551 (a), defendant also relies on 38 U.S.C. § 7425 (b) which provides that no section of title 5 that is "inconsistent" with a provision of title 38 "shall supercede, override, or otherwise modify" any provision of title 38. In this regard, defendant reverses field, arguing that the two statutes are inconsistent one with the other. Defendant's premise is exactly the opposite of its first line of defense that basic pay in subsection (i) is one and the same with "pay" in the lump-sum statute. However, § 5551 (a) is not "inconsistent" with § 7453 (i) because the court can harmonize the two statutes, one with the other. The two statutes serve two separate, not inconsistent, objectives or functions: subsection (i) only guarantees that additional pay shall not be included in basic pay when the lump-sum calculations are made, while § 5551 (a) guarantees that basic pay plus regularly earned premium pay is to be included in the lump-sum payment unless specifically excluded by Congress.

As a test of whether § 5551 (a) is inconsistent with subsection (i), assume that subsection (i) was never enacted. In that circumstance, the lump-sum payment statute would stand alone as mandating that all of the employees' "pay", including premium pay, would be

included in the lump-sum computation. The subsequent enactment of subsection (i) in title 38 does not in any way cancel out § 5551 (a). Subsection (i) only restricts additional pay from being considered as basic pay, not as "pay". There is no way to read subsection (i) as replacing § 5551 (a) with respect to the treatment of additional pay by authorizing the VA to ignore the language of the lump-sum payment in its entirety and to substitute the language of subsection (i) instead. Thus, the two statutes are not mutually exclusive, as the government argues, unless the Court rewrites § 7453 (i) to discard the word "basic" from the phrase "basic pay", or the Court rewrites § 5551 (a) to insert the word "basic" before the generic word "pay". In either instance, the Court would usurp the legislative function, an obviously undesirable and unacceptable result.

The teaching of the *Lanehart* decision provides a comparable analogy. There, the government was arguing that overtime pay under title 29 could not be paid as part of "leave pay" under title 5 because the employees obviously did not work overtime when they used paid leave. In *Abreu v. United States*, 22 Cl. Ct. 230, 236 n.8 (1991) *aff'd* 948 F.2d 1229 (Fed. Cir. 1991), this court analyzed the Federal Circuit's rejection of that argument as follows:

> The effect of that decision [*Lanehart*] was not to eliminate distinctions between the two statutory schemes. The narrow issue in that case involved construction of the Title 5 leave with pay provisions. The court held that the wording of those statutes required, in effect, an incorporation into Title 5 pay of calculations made under Title 29, even though Title 29 would not independently have permitted a recovery."

*Abreu v. United States*, 22 Cl. Ct. 230, 236 n.8 (1991) *aff'd* 948 F.2d 1229 (Fed. Cir. 1991) ("*Abreu II*"). Similarly, defendant's construction of § 7453 (i) must be rejected as a misreading of the interplay between the two statutes because it erroneously assumes that the

"basic pay" referenced in § 7453 (i) is not a subset of "pay" in § 5551 (a). Defendant refuses to recognize that the two statutes can be given effect without one provision canceling out the other, and that the lump-sum pay statute of title 5 is not "inconsistent" with subsection (i) of title 38.

### F. THE INTERPLAY BETWEEN THE LUMP-SUM LEAVE PAYMENT STATUTE AND THE LIMITATION UPON CONSIDERING ADDITIONAL PAY AS BASIC PAY IN SECTION 7453 (i)

Defendant's reliance upon Congress' use of the phrase "basic pay" in § 7453 (i) raises the following questions:

Was Congress confused in drafting § 7453(i) between "additional pay" and "basic pay" and actually intended to bar any additional pay from inclusion in the lump-sum payment computation? Did Congress not realize that there was a distinction between "basic pay", "additional pay', and "pay" when it enacted § 7453 (i)? Can it be rationally said that Congress legislated "with clarity" the exclusion of all additional pay from the lump-sum computation of "pay" when it directed that additional pay "shall not be considered as basic pay"?

There can be no question as to the plain and universally accepted meaning of "basic pay". Therefore, plaintiffs contend that it is not permissible for a court to speculate as to what Congress *may have intended.* The wording of the statute that was actually enacted leaves no doubt as to its plain meaning. *See Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text . . . ."); *Holloway v. United States*, 526 U.S. 1, 6 (1999) ("[T]he language of the statutes that Congress enacts provides the most reliable evidence of its intent. For that reason, we typically begin the task of statutory construction by focusing on the words that the drafters have chosen."); *AFGE, Local 3295 v. FLRA*, 46 F. 3d 73, 78 (D.C. Cir. 1995) ("Petitioner asks us to assume that Congress

was confused but offers no support for that dicey proposition. Petitioner's hypothesis, moreover, is flatly inconsistent with the familiar principle that Congress legislates with a full understanding of existing law. *See, e.g., Miles v. Apex Marine Corp*., 498 U.S. 19, 32, 111 S.Ct. 317, 325-26, 112 L.Ed.2d 275 (1990); *Cannon v. University of Chicago,* 441 U.S. 677, 696-97, 99 S.Ct. 1946, 1957-58, 60 L.Ed.2d 560 (1979)").

As plaintiffs have noted, *supra*, in *Lanehart v. Horner*, 818 F.2d 1574, 1581 (Fed. Cir. 1987), the Federal Circuit parsed the word "pay" in the "leave with pay" statutes with the following observation: "…Congress has used more limited terms, rather than the generic term 'pay,' when it intended to refer to specific types of pay. For example, §§ 5504, 5542 and 5545 use the phrase 'basic pay' and §§ 5542, 5545, 5546 and 5547 speak to 'premium pay.' Moreover, when Congress has intended to exclude certain types of remuneration from a pay statute it has done so with clarity."

In the very first sentence of the same statute, § 7453 (a), as subsection (i), Congress clearly recognized the distinction between additional pay and basic pay: "*(a) In addition to the rate of basic pay provided for nurses, a nurse shall receive additional pay as provided by this section."* It is folly even to suggest that Congress misunderstood the terminology. For this Court to hold as defendant asks would be to defy the preeminent canon of statutory interpretation that a court must "presume that the legislature says in a statute what it means and means in a statute what it says there." Bedroc Ltd. v. United States, 541 U.S. 176, 183 (2004).

Defendant's contention that the language of section 7453(i) operates to exclude all forms of additional pay under 38 U.S.C. §§ 7453-7454 from lump-sum payment computations is fundamentally flawed in that it requires the Court to perform a legislative, not a judicial, function by rewriting section 7453(i) to remove the word "basic" from the phrase "basic pay".

## G. LEGISLATIVE HISTORY OF 38 U.S.C. § 7453 (i)

In this section of Plaintiffs' Opposition to Defendant's Motion to Dismiss, we discuss the legislative history of 38 U.S.C. § 7453(i), which concerns the characterization of additional pay for nurses and "hybrid" employees of the Department of Veterans Affairs.

### 1. The Veterans Health Care Expansion Act of 1973

Additional pay provisions for VA nurses were originally enacted as part of the Veterans Health Care Expansion Act of 1973, Pub. L. No. 93-82, 87 Stat. 179 (1973). The Act added a new subsection (e) to what was then Section 4107 of Title 38, entitled "Grades and Pay Scales." Subsection (e)(1) provided for additional compensation as specified in paragraphs (2) through (8) of that subsection, namely night premium pay, weekend premium pay, holiday pay, overtime pay, and "on call" premium pay. Significantly, subsection (e)(1) specified that the enumerated premium pay shall be "in addition to the rate of basic compensation provided for nurses in subsection (b)(1)…." Subsection (e)(9) then provided:

> "Any additional compensation paid pursuant to this subsection shall not be considered as basic compensation for purposes of subchapter VI and section 5595 of subchapter IX of chapter 55, chapter 81, 83, or 87 of title 5, or other benefits based on basic compensation."

For purposes of the exclusion now appearing in 38 U.S.C. § 7453 (i)(1), the statute has remained substantively unchanged since its enactment in 1973.[6] Thus, §7453(i) was enacted at the same time as premium pay in the form of "additional pay". Congress therefore knew the distinction between "basic pay" and "additional pay," and if it had wanted to exclude additional pay entirely from Chapter 63 Part VI, it could have done so by declaring that the "additional" pay enumerated in the statute shall not be considered as "pay" for purposes of

[6] Pub. L. no. 94-581, 90 Stat. 2848 (1976) substituted "pay" for "compensation" in several places in subsection (e), including in (e)(9). This is consistent with earlier changes enacted in 1966 applicable to Title 5 of the United States Code. See Pub. L. No. 89-554, 80 Stat. 488 (1966).

Subchapter VI of chapter 55, rather than just "basic pay." Alternatively, Congress could have amended 5 U.S.C. § 5551(a) to exclude 38 U.S.C. §§ 7453 and 7454, as it explicitly did in entirely excluding sections 5925 and 5928.

**2. <u>Congressional Intent</u>**

The relevant House Report explains that the basic purpose of the bill "is to improve the ability of the Veterans' Administration to deliver quality medical care to its beneficiaries by…[among other things] improving the personnel system of the Department of Medicine and Surgery (DM&S)…and to make DM&S more attractive to skilled health care personnel and thus more able to compete for scarce health care manpower…." H.R. Rep. No. 368, 93rd Cong. (1973), *reprinted in* 1973 U.S. Code Cong. & Ad. News, 1688, 1689. With specific regard to the additional pay provisions, the House Report explains:

> *New subsection (e)* establishes overtime and premium pay benefits for VA nurses (and it is intended that this provision shall be applied to intermittent and part-time nurses) generally comparable to those now available to General Schedule and Wage Board employees….
>
> *Paragraph 9 of the new subsection* provides that additional pay under this new subsection will not count as basic compensation for lump-sum leave payments, severance pay, and other benefits relating to basic compensation.

*Id.* at 1706-08. The Senate Report is to the same effect. S. Rep. No. 54, 93rd Cong., 1st Sess., 48-49 (1973).

Both reports state that Paragraph 9 is identical to a provision appearing in an earlier bill, H.R. 10880, the Veterans Medical Care Act of 1971, which President Nixon pocket-vetoed for reasons unrelated to the additional pay provisions for nurses. The House Report accompanying the earlier bill provides further background concerning the need for such provisions:

> Under current law Veterans Administration nurses do not receive premium pay for those conditions of work which are generally regarded as more onerous to employees both within and without the Federal Government. A study of hospital practices shows that non-Federal hospitals almost universally provide extra pay for nurses working on evening and night tours of duty. Also, by law, Federal employees under the General Schedule, Postal Field Service, and prevailing rate systems of pay are entitled to premium pay for such considerations as Sunday and overtime duty.
>
> The Veterans Administration has found it very difficult to attract and retain qualified nurses for the evening and night tours of duty in many Veterans Administration hospitals. An impairment of our ability to provide adequate nursing care for our ill and disabled veteran patients could result unless immediate action is taken to strengthen our position in this matter.
>
> Developments in recent years with respect to the matter of nurses' pay in private, community, and state hospitals throughout the country make it necessary for the Veterans' Administration, which operates the largest single system of medical facilities in the world, to provide a rounded compensation plan for nurses, including customary provisions for premium pay, in order to remain competitive in attracting and retaining highly qualified nursing personnel.

H.R. Rep. No. 515, 92nd Cong., 1st Sess., 15-16 (1971) (*quoting* analysis submitted by the V.A.).

With regard to the exclusion of additional compensation from basic compensation, the House Report merely states that "the additional compensation provided by this section would not be considered basic compensation for purposes of lump-sum leave payments, severance pay, compensation for work injury, retirement, life insurance, or other benefits relating to basic compensation." *Id.* at 15 (*quoting* analysis submitted by the V.A.). This is a more exhaustive list than that provided in the subsequent legislative reports. The explicit reference to "basic compensation"—not "pay"—with respect to the computation of lump-sum leave payments, however, appears in all of them.

Further examination of the Congressional Record for 1972 and 1973 adds additional insight into legislative intent. All discussion of the additional pay provisions for the V.A.

concerned only the premiums themselves. For example, Senator Cranston, one of the sponsors of S. 59, the Senate version of the bill that was enacted, stated that the bill "provides overtime and premium pay for 20,000 V.A. registered nurses who are now deprived of these benefits that are paid to all other Federal nurses." 119 Cong. Rec. 6639 (March 16, 1973). Congressman Satterfield likewise explained: "Such differentials are the general rule with respect to nurses' compensation in civilian hospitals and the V.A. committee feels that the V.A. nurses should not receive less favorable treatment. We believe that this provision will act as a real factor in improving the recruitment and retention of nurses whose services, of course, are invaluable to the overall medical mission." *Id.* at 24200 (July 17, 1973).

What emerges from these reports is the clear motivation of Congress to improve the compensation of VA nurses by providing premiums already available in federal employment and the private sector. With this motivation in mind, it defies logic to suggest that the intent of the language of the statute was to provide less incentive to nurses and other health care professionals to join the staff of the VA by excluding additional pay from their lump-sum leave payments. But defendant would do exactly that by treating the term-of-art "basic pay" in what is now §7453(i) as a total ban, or exclusion, of "additional" pay from the computation of the lump-sum payment for annual leave--a gross misreading of the plain language of the statute and its legislative history. Defendant claims that by these provisions of law, the Secretary was given the power to enhance the compensation of nurses in order to bring that compensation in line with what is paid in the private sector as well as to other public employees under title 5--but at the same time, defendant asks this Court to hold that §7453(i) would *decrease* their

benefits by excluding additional pay from the lump-sum leave computation.[7]

Finally, even though the rules of statutory construction provide that the Court should give effect to the plain meaning of the term "basic pay" in § 7453 (i) without resorting to reliance upon its legislative history, nonetheless a complete examination of the legislative history of the enactment of sub-section (i) affords defendant no comfort. The legislative history demonstrates conclusively that Congress never expressed any intention to exclude additional pay in its entirety from an employee's "pay" in the computation of the lump-sum payment pursuant to § 5551 (a).

**H. SUMMATION OF PLAINTIFFS' ARGUMENT**

The rules of statutory construction articulated in *Lanehart* and *Armitage*, and the principles of law enunciated there, are clearly applicable here in interpreting the interplay between the lump-sum leave payment statute and the narrower limitation upon "additional pay" contained in § 7453(i) rather than the broader total exclusion sought by the government in its motion to dismiss.

First, the Federal Circuit particularly emphasized that "Congress has used more limited terms, rather than the generic term 'pay', when it intended to refer to specific types of pay", and when it excluded various categories of pay, it did so "with clarity". *Lanehart, id*., at 1582. The exclusion within the text of § 5551 (a) of premium pay pursuant to sections 5925 and 5928 from the computation of the lump-sum is a model of clarity. But, defendant's tenuous statutory

[7] It may be argued that Congress did not care about enhancing the lump-sum payment benefit because the employees who would receive the lump-sum have left federal government employment. But, that reasoning runs counter to the legislative history of the lump-sum payment, *supra*, which demonstrated that Congress accepted its responsibility to pay employees the same amount of money for accrued vacation leave whether they used the leave or received a lump-sum for unused annual leave. The lump-sum benefit not only is matter of basic equity with respect to the payment for accumulated and earned vacation leave, but the lump-sum also serves as a positive incentive for employees during their term of employment because it rewards them for refraining from using annual leave with a cash reward at the end of their service equal to the amount they would have received if they used the leave instead.

construction argument based solely on Congress' use of the term-of-art "basic pay", rather than "pay", in § 7453 (i) fails to demonstrate that Congress intended to exclude nurses' additional pay entirely from the computation of "pay". Defendant's argument based on subsection (i) simply pales in comparison to Congress' exclusion of sections 5925 and 5928 "with clarity".

Second, for the government's argument in the case at bar to succeed, this Court necessarily either must insert the word "basic" before the word "pay" in § 5551 (a), contrary to the express language of the OPM's interpretative regulation (and the VA Secretary's Handbook), or the Court must read the word "basic" out of the phrase "basic pay" in § 7453 (i). Of course, the latter interpretation would be contrary to the plain meaning of the statutory phrase "basic pay" and, as well, contrary to the legislative history recounted in this memorandum, *supra*, while the former interpretation changing "pay" in the lump-sum statute to "basic pay" does violence to OPM's and the VA's well established regulatory interpretation. In *Bailey v. United States*, 52 Fed. Cl. 105, at 110 (2002), this court rejected the government's interpretation of the word "administrative' in § 7121(a)(1) on the ground that it read the word "administrative" out of the statute. The Federal Circuit noted this court's reasoning with approval in *Mudge*, *id.*, at 1226. Then, the Federal Circuit adopted the analysis in *Bailey* as its own by stating "the government's interpretation impermissibly reads the word 'administrative' out of the subsection". *Mudge, id.*, at 1229. The conclusions drawn in *Bailey* and *Mudge* are particularly apt if applied here to defendant's claim that "basic pay" in subsection (i) is synonymous with "pay" in the lump-sum statute.

Third, the Federal Circuit's teaching in *Mudge, id.,* at 1229-30, with respect to the government's burden of proof under these circumstances is compelling:

> Third, the government urges us to construe § 7121(a)(1) contrary to its plain language on the ground that the legislative history surrounding the 1994 amendments does not demonstrate that Congress intended to establish a federal employee's right to seek judicial relief for grievances covered by his or her CBA by adding the word "administrative" to the phrase "exclusive procedures." According to the government, "[i]f Congress intended such a drastic change to the current scheme, it is inconceivable that the legislative record would not reflect some discussion or debate of that change" (citing O'Connor, 50 Fed. Cl. at 293). In this respect, the government reiterates the Court of Federal Claim's conclusion that Congress would not fundamentally alter the CSRA "without discussion, explanation, or debate." Mudge, 50 Fed. Cl. at 506.
>
> The government's legislative history argument lacks merit. The government impermissibly distorts the correct approach to legislative history when it suggests that Mr. Mudge bears the burden of finding additional support therein for the plain and unambiguous language of the statute. As the Supreme Court stated in Harrison v. PPG Industries, Inc., 446 U.S. 578, 592 n.8 (1980), "it would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute." See also Mansell v. Mansell, 490 U.S. 581, 592 (1989) ("Congress is not required to build a record in the legislative history to defend its policy choices.").
>
> To the contrary, it is the government that must show clear legislative history supporting its construction because it is the government that seeks to construe the statute contrary to its plain text. See Garcia v. United States, 469 U.S. 70, 75 (1984) ("[O]nly the most extraordinary showing of contrary intentions from [the legislative history] would justify a limitation on the "plain meaning" of the statutory language."); see also Mansell, 490 U.S. at 592 (holding that the plain and unambiguous meaning of a statute prevails in the absence of clearly expressed legislative intent to the contrary); Massing v. Sec'y of Dep't of Health & Human Servs., 926 F.2d 1133, 1135 (Fed. Cir. 1991) (holding that in order to construe the statute contrary to its plain meaning, petitioner "must show clear legislative history supporting its asserted construction.") (internal citation omitted). The government may not discharge this burden by pointing to what the legislative history does not demonstrate. Where, as here, that history fails to make the sort of "extraordinary showing" required by Garcia, we must construe the statute according to its plain language. See Aaron v. SEC, 446 U.S. 680, 695 (1980) (holding that the plain meaning of a statute governs "[a]bsent clear and strong congressional intent to the contrary"); Johns-Manville Corp. v. United States, 855 F.2d 1556, 1559 (Fed. Cir. 1988) (holding that before the court will construe the statute contrary to its plain meaning, petitioner "must show clear

legislative history supporting its asserted construction."). The plain language of amended § 7121(a)(1), which provides that the negotiated procedures contained in a CBA are to be the "exclusive administrative procedures for resolving grievances which fall within its coverage," does not limit a federal employee's right to avail him or herself of alternative, non-administrative avenues of redress.[8[5]] 5 U.S.C. § 7121(a)(1) (2000).

Fourth, and finally, in *Artuz v. Bennett*, 531 U.S. 4, 10 (2000), the Supreme Court articulated the fundamental difference between the function of the judicial branch in deciding statutory interpretation and the role of the legislature in statutory enactment: "Whatever merits these and other policy arguments may have, it is not the province of this Court to rewrite the statute to accommodate them. We hold as we do because respondent's view seems to us the only permissible interpretation of the text." *See also*, *Carter v. Gibbs*, 909 F.2d 1452, 1455 (Fed. Cir. 1990) (en banc), *cert. denied*, 498 U.S. 811 (1990).

In accordance with the established rules of statutory construction, appropriate statutory analysis of the lump-sum statute and § 7453 (i) can lead only to the following conclusions:

(1) The phrase "basic pay" in § 7453 (i) is susceptible of one plain meaning as used by Congress throughout the United States Code, and as defined by the Secretary and OPM: "The rate of pay fixed by law or administrative action for the position held by an employee before any deductions and exclusive of additional pay of any kind". VA Handbook 5007, Part IV, Chapter 3, subsection 6 (e). The statute is clear. "Basic pay" in § 7453 (i) is a term-of-art that can not be changed or modified except by an Act of Congress.

(2) "Pay" in § 5551 (a) has been interpreted consistently by OPM, the VA, and the courts to mean basic pay plus premium pay. With this background of long-standing interpretation of a generally applied statute, there is no rationale of statutory

construction that would permit a court now to ignore OPM's interpretation of "pay" and substitute a new definition that "pay" means only basic pay.

**(3) Therefore, "pay" in § 5551 (a) can not conceivably be interpreted to mean only "basic pay", and "basic pay" as used in § 7453 (i) can not conceivably be interpreted to mean "pay" as used in § 5551 (a).**

**(4)** The two statutes may be harmonized in order to give an independent meaning to both sections, as follows:

(a) registered nurses' additional pay "shall not be considered as basic pay" in the computation of the lump-sum payment for registered nurses, other health care professionals, and hybrids;

(b) "basic pay" is a sub-set of "pay" when the VA computes the lump-sum payment; and

(c) therefore, the computation of the lump-sum payment required by § 5551 (a) should consist of "basic pay'" plus additional premium pay regularly earned pursuant to § 7453 (a)-(h) by nurses, other health care professionals, and hybrids.[9]

[9] In their Third Amended Complaint, by virtue of the Severance Order and as a continuation of the claims filed initially in the *Archuleta* case on April 7, 1999, plaintiffs assert claims under the lump-sum payment statute for Sunday premium pay. (Paragraph 2, subsections 2 and 3). The statute mandates payment for regular and customary scheduled premium pay, such as Sunday pay, that the employee would have received during the period of accrued but unused annual leave. Congress barred the payment of Sunday premium pay to employees who do not actually work on Sunday effective at the start of Fiscal Year 1998 (October 1, 1997, the date that Fiscal Year 1998 began). Thus, plaintiffs' claims for Sunday premium pay should run from the start of the limitations period to the beginning of Fiscal Year 1998, i.e., from April 7, 1993 to September 30, 1997. However, due to a typographical error, plaintiffs erroneously asserted that their claims are for Sunday premium pay prior to Fiscal 1999, instead of the correct date which is Fiscal 1998. Plaintiffs' counsel apologizes for this inadvertent but harmless error inasmuch as defendant has not even filed its Answer at this point in the litigation. Plaintiffs respectfully request approval of the Court to deem their Third Amended Complaint corrected to read "Fiscal 1998" in this regard. Defendant overreaches by arguing that the court should dismiss these claims in their entirety because of this error. Def. Brief, p. 20.

WHEREFORE, plaintiffs respectfully submit that defendant's motion to dismiss should be denied.

/S/_IRA M.LECHNER_____

IRA M. LECHNER
Attorney for Plaintiffs
19811-4th Place
Escondido, CA 92029
Phone: 858-864-2258
Fax; 760-839-5755

Dated: May 1, 2007

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 1st day of May, 2007, a copy of the foregoing "PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS", was filed electronically in the United States Court of Federal Claims. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing system.

**I.** **S/IRA M. LECHNER**
Ira M. Lechner